## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Michael Joseph Roy,                                   Civil No. 11-1258 (DWF/LIB)

              Plaintiff,

v.                                                            **MEMORANDUM**
                                                        **OPINION AND ORDER**
Officer D.J. Regas,
in his individual capacity, and
The City of Bemidji,

              Defendants.

---

Zorislav R. Leyderman, Esq., The Law Office of Zorislav R. Leyderman, counsel for
Plaintiff.

Daniel P. Kurtz, Esq., Pamela L. VanderWiel, Esq., and William J. Everett, Esq., Everett
& VanderWiel, PLLP, counsel for Defendants.

---

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by

Defendants Officer D.J. Regas ("Officer Regas") and the City of Bemidji (the "City").

(Doc. No. 18.)  For the reasons set forth below, Defendants' motion is granted in part and

denied in part.

## BACKGROUND

On August 2, 2010, Plaintiff Michael Joseph Roy ("Roy") was at the home of

Gretchen Foster-Schmidt ("Foster-Schmidt").  (Compl. ¶ 8; Doc. No. 29, Leyderman Aff.

¶ 2, Ex. 1 ("Roy Dep.") at 19.)  Foster-Schmidt had an order for protection against Roy,

which prohibited Roy from contacting Foster-Schmidt.  (Roy Dep. at 19.)  Despite that

order for protection, Roy claims that he was essentially living with Foster-Schmidt with

her consent.  (*Id*.)  On that day, Roy and Foster-Schmidt fought, and Roy hit

Foster-Schmidt on the side of the head with an open fist.  (*Id*. at 20.)  Foster-Schmidt was

able to send a text message to her mother asking her to call the police.  (*Id*. at 20-21.)

Beltrami County dispatch contacted Officer Regas and sent him to Foster-Schmidt's

residence on a "check welfare" call.  (Leyderman Aff. ¶ 3, Ex. 2 ("Regas Dep.") at 26.)

Dispatch indicated that there was a ten minute delay between the time when Foster-

Schmidt's mother received her text and she called the police.  (*Id*.)  Dispatch also

informed Officer Regas that Roy had three "no contact" orders on file that prohibited Roy

from having contact with Foster-Schmidt, and that Foster-Schmidt had prior problems

with Roy coming to the residence.  (*Id*. at 27-28.)[1]

        After listening outside the door,[2] Officer Regas knocked and announced that he

was with the police department, but there was no response.  (Regas Dep. at 41-42.)

Officer Regas then walked to the side of the building and looked through a window.  (*Id*.

at 42-43.)  Officer Regas saw a "smashed coffee table turned upside down and broken up

in pieces" and an "[o]scillating fan was broken and lying in the middle of the living

---

[1]      Officer Regas testified that he had previous law enforcement contacts with Roy
and that Roy had a reputation for attempting to flee.  (Regas Dep. at 30-32.)

[2]      Officer Regas heard a television, a person moving inside the apartment, and a
baby cooing.  (Regas Dep. at 40-41.)

room." (*Id*. at 43.)  Officer Regas concluded that a physical altercation had taken place and he called for back-up. (*Id*. at 43-44.)

While waiting for back-up, Officer Regas saw through a second window (which was open) that Foster-Schmidt was sitting on a bed, crying, and holding and rocking her baby with "a terrified look on her face." (*Id*. at 45.)  Officer Regas whispered to Foster-Schmidt, asking if Roy was in the apartment. (*Id*. at 49.)  Foster-Schmidt nodded in the affirmative. (*Id*.)  Officer Regas remained outside the window in case Roy appeared. (*Id.* at 52-53.)

At some point, Roy saw two officers standing in the hallway of the apartment building through the peephole, and he saw an officer go to a window. (Roy. Dep. at 21-22.)  Roy apologized to Foster-Schmidt and told her to tell the police that he was not there. (*Id*. at 22.)  Roy decided to hide from the police officers and climbed into the kitchen cabinet under the sink and closed the door. (*Id*. at 24-25.)

Officers Michelle Leffelman, Randal Moyer, and Daniel Seaberg arrived at the apartment. (Regas Dep. at 53-57.)  Officer Regas instructed Officer Seaberg to remain outside the open window while he and Officers Leffelman and Moyer prepared to enter the apartment. (*Id*. at 56-57.)  Officer Regas knocked on the apartment door and yelled "Police!  Michael Roy, if you're in the apartment, come to the door now." (*Id*. at 57-59.)  There was no response, so the officers knocked again and announced that they were going to enter. (*Id*. at 58-59.)  The officers entered the apartment and conducted an initial search, but did not find Roy. (*Id*. at 61-62.)  The officers conducted another search. (*Id*.)  Officer Moyer found Roy hiding in the kitchen cabinet. (Roy Dep. at 28; Regas Dep. at

64-65.)[3]  Officer Moyer ordered Roy to exit the cabinet.  (Roy Dep. at 28.)  Officer Regas

heard the commands and went to the kitchen.  (Regas Dep. at 65-68.)  All three Officers

ended up in the kitchen; Officer Regas was next to Officer Moyer, who was yelling

"Show me your hands!"  (*Id*. at 72.)  Officer Leffelman had her Taser out.  (*Id*. at 67-68.)

Both Officers Roy and Moyer had their guns drawn.  (*Id*. at 70.)  Roy began moving out

of the cabinet on his hands and knees, and he said "Okay.  Coming out."  (*Id*. at 75; Roy

Dep. at 29, 30-31.)  Roy claims that he laid flat on the ground.  (Roy Dep. at 32.)

Roy claims that even after he was lying on the ground, one of the officers yelled,

"Get on the fucking ground!"  (Roy Dep. at 33.)[4]  Roy then said something to the effect

of "Okay, you fucking asshole."  (Roy Dep. at 34; Regas Dep. at 83.)  Roy claims that he

said this as he was lying on the ground.  (*Id*. at 34.)  Defendants assert that Roy lifted his

head and raised himself up into a "push-up" position while he spoke.  (Regas Dep. at 83.)

Officer Regas claims that he held Roy down by placing his foot on Roy's back and

shoulder.  (Regas Dep. at 83, 89.)  Officer Regas also claims that he thought that Roy was

trying to flee or attack.  (*Id*. at 107.)  Roy, on the other hand, claims that, while it is

possible that he lifted his head, his face was only approximately 1½ inches off the ground

and that he could only see the officers' feet.  (Roy Dep. at 36, 39.)  Roy also claims that

Officer Regas "slammed" his foot on top of his head.  (*Id*. at 35-38.)

---

[3]     Roy testified that Officer Regas found him, but later clarified that it could have
been Officer Moyer.  (Roy Dep. at 28.)

[4]     Roy asserts that it was Officer Regas who yelled.  (Roy Dep. at 34.)

Roy's chin hit the floor, split open, and started bleeding.  (*Id.* at 40.)  Roy was then handcuffed and lifted off the ground.  (*Id.* at 38, 39.)  When he was lifted, Roy saw a pool of blood on the floor.  (*Id.* at 39.)  Roy was taken to the emergency room, where he received six stiches to close the wound.  (*Id.* at 42, 44.)  The medical records indicate that Roy had a 2.5 centimeter laceration on his chin.  (*Id.* at 43, 44 & Ex. 2.)

Roy filed his Complaint against Officer Regas and the City, asserting the following causes of action:  (1) unreasonable search and seizure and excessive force against Officer Regas; (2) unreasonable search and seizure and excessive force against the City;[5] (3) assault against all Defendants; (4) battery against all Defendants; (5) intentional infliction of emotional distress against all Defendants; and (6) negligent infliction of emotional distress against all Defendants.

**DISCUSSION**

**I.     Legal Standard**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural

---

[5]     Count Two against the City was dismissed with prejudice pursuant to the parties' stipulation.  (Doc. No. 17.)

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*,

92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in

the record that create a genuine issue for trial.  *Krenik v. County of Le Sueur*,

47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for

summary judgment "may not rest upon mere allegations or denials of his pleading, but

must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.    Excessive Force Under 42 U.S.C. § 1983

Roy asserts that Officer Regas violated his Fourth Amendment rights by using

excessive force to effect his arrest; in particular, by using his foot to push Roy's head to

the floor so as to cause the injury to his chin.  Officer Regas asserts that he is entitled to

qualified immunity on this claim.

The doctrine of qualified immunity protects state actors from civil liability when

their "conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known."  *Harlow v. Fitzgerald,* 457 U.S. 800, 818

(1982).  The defense provides "ample room for mistaken judgments" as it protects "all

but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs,*

475 U.S. 335, 341, 343 (1986).  To overcome the defense of qualified immunity, a

plaintiff must show that:  (1) the facts, viewed in the light most favorable to the plaintiff,

demonstrate the deprivation of a constitutional or statutory right; and (2) the right was

clearly established at the time of the deprivation.  *Parrish v. Ball*, 594 F.3d 993, 1001

(8th Cir. 2010) (citation omitted).  The Court has discretion to decide which qualified

immunity prong to consider first.  *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

The Fourth Amendment prohibits unreasonable seizures.  *Graham v. Connor*, 490

U.S. 386, 394-95 (1989).  The Court evaluates excessive force claims under an

objective-reasonableness test.  *Id*. at 397.  In determining whether the use of force is

"reasonable" under the Fourth Amendment, a court must balance "the nature and quality

of the intrusion on the individual's Fourth Amendment interests" against the

government's interests at stake.  *Id*. at 396 (citation omitted).  The reasonableness of the

use of force must be judged from the "perspective of a reasonable officer on the scene,

rather than with the 20/20 vision of hindsight."  *See id*.  The proper application of the

Fourth Amendment "requires careful attention to the facts and circumstances of each

particular case, including the severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officers or others, and whether he is actively

resisting arrest or attempting to evade arrest by flight."  *Id*.  The question is whether the

"totality of the circumstances" justify a particular seizure.  *Id*.  (citing *Tennessee v.*

*Garner,* 471 U.S. 1, 8-9 (1985)).  The Court's decision turns on the question of whether,

taking the facts in the light most favorable to Roy, Roy was subjected to excessive force

so as to violate a constitutional right and, if so, whether that right was clearly established at the time.

Defendants contend that Officer Regas used force that was objectively reasonable, relying primarily on the following assertions:  (1) Officer Regas knew he was dealing with a violent individual; (2) Officer Regas knew of Roy's history of fleeing from police; (3) Roy was found hiding in a cabinet; (4) Roy was in a confined space; (5) Roy moved suddenly when he was on the floor; and (6) Officer Regas believed that Roy was trying to get up to either flee or attack.  In addition, Defendants argue that Officer Regas had his firearm drawn and that it would have been foolish for Officer Regas to wait and see what Roy would do next.  Officer Regas claims that he placed his foot on Roy's back and pushed him down to keep Roy on the ground so that he could be handcuffed.

Roy asserts that although he initially hid from the police officers, the facts when viewed in the light most favorable to him, show that he was cooperative and compliant with the Officers after he was located.  For example, Roy asserts that when he was discovered in the cabinet, he complied by crawling out and lying flat on the ground as instructed.  Roy contends that while he was lying on the ground, Officer Regas continued to yell at him:  "Get on the fucking ground!"  (Roy Dep. at 31, 33.)  And while Roy concedes that he stated, "Okay, you fucking asshole," and that it was possible that he lifted his head, Roy also testified that his face was only 1½ inches off the ground.  (*Id.* at 36, 39.)  Roy also testified that Officer Regas slammed his foot on Roy's head.  In addition, Roy contends that, at the time, Officer Regas did not have any evidence indicating that Roy had assaulted or injured Foster-Schmidt or that he was otherwise

being violent that day.  Moreover, Roy points out that Officer Regas testified that he could see that Roy's hands were empty and there were no dangerous objects in close proximity.

Viewing these facts in the light most favorable to Roy, the fact that Roy swore at the officers and slightly lifted his head, could lead a reasonable juror to conclude that Roy was being uncooperative or unpleasant, but a reasonable juror could also conclude that Roy was not otherwise resisting arrest or attempting to flee.  The Court finds that a reasonable juror could further conclude that Officer Regas' use of his foot to push Roy's head down was unreasonable under the circumstances and therefore excessive, particularly if the juror believed that Roy only lifted his head 1½ inches off the ground and Officer Regas "slammed" his head down.  Thus, the Court finds, again viewing the facts in the light most favorable to Roy, that a reasonable juror could conclude that Officer Regas deprived Roy of a constitutional right by using excessive force.  The Court now turns to whether that right was clearly established at the time of the deprivation.

Defendants argue that, at the time of the incident, it was not clearly established that Officer Regas violated Roy's constitutional right by applying force because the force only caused *de minimis* injury.  In support, Defendants argue that prior to *Chambers v. Pennycook*, 641 F.3d 898, 901, 906 (8th Cir. 2011), a section 1983 plaintiff alleging excessive force had to demonstrate more than *de minimis* injury to defeat qualified immunity.  Here, Roy suffered from a laceration on his chin that required six stitches. Medical records indicate that it was a "major laceration" and that Roy experienced significant pain.  (Roy Dep. Ex. 2.)  For purposes of its qualified immunity analysis, the

Court concludes that this injury is not *de minimis* as a matter of law.  *See*, *e.g.*, *Copeland v. Locke*, 613 F.3d 875, 881-82 (8th Cir.  2010) (finding lacerations from handcuffs and an injury to the knee not *de minimis*).  Therefore, Roy has pointed to sufficient evidence of actual injury to overcome Defendants' assertions of qualified immunity.

## III.   Assault and Battery[6]

Roy also asserts claims for assault and battery against Defendants.  An assault is an unlawful threat to do bodily harm to another with the present ability to carry out the threat.  *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990).  Battery is "an intentional, unpermitted offensive contact with another."  *Id*. at 40.  Because Roy's excessive force claim remains, summary judgment is inappropriate on Roy's state-law claims of assault and battery.

Defendants also argue that Roy's assault and battery claims are barred by the doctrine of official immunity.  Under Minnesota law, public officials are automatically entitled to official immunity from state law claims when their duties require the exercise of discretion, so long as the officer is not guilty of a willful or malicious wrong.  *See id*. at 41-42.  Police officers are generally classified as discretionary officers.  *Id*. at 42. Here, there is no question that Officer Regas's actions required the exercise of discretion.

---

[6]   In his Complaint, Roy also alleges state-law claims for Intentional Infliction of Emotional Distress (Count Five) and Negligent Infliction of Emotional Distress (Count Six).  Defendants moved for summary judgment on both of these counts.  However, Roy did not rebut Defendants' arguments in his opposition brief or otherwise point to evidence to support these counts.  Having failed to do so, summary judgment on Counts Five and Six is properly granted.

*See, e.g.*, *Pletan v. Gaines*, 494 N.W.2d 38, 41 (Minn. 1992).  Accordingly, to defeat official immunity, Roy must establish malice or willfulness.  Malice in the context of official immunity requires proof of an officer's intentional doing of a wrongful act without legal justification or excuse.  *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991).  Here, as explained above with respect to Roy's excessive force claim, Roy has put forth evidence sufficient to persuade a reasonable juror that Officer Regas knew or should have known that his actions in stepping on Roy's head were without legal justification.  Accordingly, the Court concludes that Defendants are not entitled to official immunity.  Thus, summary judgment on Roy's assault and battery claims is properly denied.

## CONCLUSION

For the reasons discussed above, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. [18]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.      Counts Five and Six of Plaintiff's Complaint (Doc. No. [1]) are **DISMISSED WITH PREJUDICE**.

2.      Counts One through Four remain for trial.

Dated:  January 2, 2013                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge